# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

CASE NO 07-20119



FILED by ___ D.C.
INTAKE

JAN 16 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

CIV-JORDAN

[TORRES]

| | |
|---|---|
| **SIMONE JOACHIM-ARNAUD**, As Personal Representative of the Estate of **JIMMY JOACHIM-ARNAUD,** Deceased, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| **WEST CARIBBEAN AIRWAYS, S.A.**, a Colombian corporation; **THE AERONAUTICS OF ASTRONAUTICS SERVICES U.S.A., INC.,** a Nevada corporation doing business in Florida; **MK AVIATION U.S.A., INC.**; a Nevada corporation; **MK AVIATION, S.A.**, a closely held Panamanian corporation; **MK LEASING U.S.A., (LTD)**, a United States corporation; **MKA CAPITAL, INC.**, a Nevada corporation; **MORDECHAY KRASELNICK,** also known as **MORY KRASELNICK**, also known as **MOREY KRASELNICK**, also known as **MORDECHAI KRASELNICK,** also known as **MK**, Individually; **GLOBE-TROTTERS DE RIVIÈRE SALÉE TRAVEL**, a foreign corporation; **SAMIR CVRK**, Individually; **VALERIE CVRK**, Individually; **NEWVAC CORPORATION**, a Florida corporation; **GO 2 GALAXY, INC.**, a Florida corporation; **JACQUES CIMETIER**, Individually; **ASEGURADORA COLSEGUROS, S.A.**, a Colombian corporation, and **SANCON RESOURCES RECOVERY, INC.**, a Nevada corporation. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT**
**FOR DAMAGES**

**WRONGFUL DEATH AND**
**SURVIVAL ACTION**

**JURY DEMAND**

©2006 Motley Rice LLC.  All rights reserved.

COMES NOW Plaintiff, by and through undersigned counsel and for her cause of action files this Complaint against Defendants WEST CARIBBEAN AIRWAYS, S.A., a Colombian corporation ("WEST CARIBBEAN"); THE AERONAUTICS OF ASTRONAUTICS SERVICES, U.S.A., a Nevada corporation, MK AVIATION U.S.A., INC., a Nevada corporation; MK AVIATION, S.A., a closely held private Panamanian corporation ("MKA"); MK LEASING U.S.A., (LTD.), a Nevada corporation; MKA CAPITAL, INC., a Nevada corporation, MORDECHAY KRASELNICK, also known as MORY KRASELNICK, also known as MOREY KRASELNICK, also known as MORDECHAI KRASELNICK, also known as "MK", individually ("MORY KRASELNICK"), doing business in Florida, Texas, Nevada and California; GLOBE-TROTTERS DE RIVIÈRE SALÉE TRAVEL, a foreign corporation; SAMIR CVRK, Individually; VALERIE CVRK, Individually; NEWVAC CORPORATION, a Florida corporation; GO 2 GALAXY, INC., a Florida corporation; JACQUES CIMETIER, Individually; ASEGURADORA COLSEGUROS, S.A., a Colombian corporation, and SANCON RESOURCES RECOVERY, INC., a Nevada corporation, doing business in Texas, alleges on information and belief.

### JURISDICTION AND VENUE

1.      This is an action for damages in excess of $75,000, exclusive of interest, costs and attorneys fees.

2.      Jurisdiction exists over this action and DEFENDANTS under 28 U.S.C. §§ 1331, 1332, 1367 and 1369.

©2006 Motley Rice LLC.  All rights reserved.

3.     Jurisdiction and venue is proper under the Montreal Convention for the Unification of Certain Rules for International Carriage by Air (Montreal Convention) Article 33(2) because this District is the domicile and principal place of business for a contracting carrier pursuant to Article 39 of the Convention.

4.     Venue is proper under 28 U.S.C. § 1391 because the parties either reside in this District, conducted significant business related to this transaction in this District or agreed to be bound by the laws of the State of Florida in this transaction, and because the contract for carriage of transportation was made in this District.

5.     Jurisdiction is required in federal court pursuant to The Multiparty, Multi-forum Jurisdiction Act of 2002, (MDMF) which is primarily codified at 28 U.S.C. § 1369.

6.     All conditions precedent to bringing this action have been met.

### PARTIES

7.     At all times material hereto, Plaintiff SIMONE JOACHIM-ARNAUD and is a resident of Martinique, French Antilles and the personal representative of the Estate of JIMMY JOACHIM-ARNAUD, Deceased.

8.     At all times material hereto, Decedent JIMMY JOACHIM-ARNAUD, was a passenger on WEST CARIBBEAN Flight No. 708, which crashed in Venezuela en route from Panama to the island of Martinique on August 16, 2005, killing all 160 passengers and crew on board.

9. At all times material hereto, Defendant WEST CARIBBEAN AIRWAYS, S.A., was a Colombian corporation with offices in Medellín, Colombia.

10. Defendant, WEST CARIBBEAN AIRWAYS, S.A. contracted with Florida corporations and others to fly the flight that forms the basis of this action in this district.

11. MK AVIATION, S.A. is a closely held private Panamanian corporation 100% owned by MORY KRASELNICK. It does business in the United States and elsewhere and MORDECHAY KRASELNICK is the Chief Executive Officer. MK AVIATION also does business in the United States as MK AVIATION U.S.A., INC., a Nevada corporation which is an alter ego corporation owned by MORY KRASELNICK.

12. THE AERONAUTICS OF ASTRONAUTICS SERVICES USA, INC. is another MORDECHAY KRASELNICK company which on information and belief provided aviation services and parts for this and other aircraft. The KRASELNICK company is a Nevada corporation but it is located in Miami, Florida. MORDECHAY KRASELNICK is the principal, but was listed with 3 different names: MORDECHAY, MORDECHAI AND MORY KRASELNICK.

13. MK AVIATION, USA, Inc., (MKUSA) is another MORDECHAY KRASELNICK company with MORDECHAY KRASELNICK as the chief executive officer. The company is a Nevada corporation, but it is located in Dallas, Texas and it has a registered agent in Atlanta, Georgia. Through MK AVIATION USA,

©2006 Motley Rice LLC. All rights reserved.

MORY KRASELNICK conducted his United States aviation operations, including those related to this aircraft.

14.    MK LEASING U.S.A., (LTD) is a United States corporation doing business in Texas and is owned and operated by MORY KRASELNICK. Through MK LEASING U.S.A., (LTD) MORY KRASELNICK conducted his United States aviation operations, including those related to this aircraft.

15.    At all times material hereto, Defendants, NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER were doing business in Florida and were Florida corporations, authorized to do business in the state of Florida. NEWVAC, GO 2 GALAXY, INC., and JACQUES CIMETIER contracted with West Caribbean to provide air travel to the passengers aboard the ill-fated flight.

16.    MORY KRASELNICK (aka MOREY, MORDECHAI, MORDECHAY and/or MK) carried on his international aircraft and aircraft engine leasing business through a series of thinly veiled alter ego corporations.   In each corporation's public filings he is described as the majority or sole owner, founder, president, chairman, corporate executive, chief executive and/or operating officer. At all time relevant herein, he and his alter ego companies were the owner of the aircraft which crashed as Flight 708.

17.    MKA CAPITAL, INC. (MKAC) is a Nevada corporation with an agent located in Pasadena, California.   MKA CAPITAL, INC. is also the successor company of Financial Telecom Limited USA, INC. (FINTEL), a defunct Nevada Corporation.  FINTEL had a business address in Shanghai, China and listed its

majority owner as MORDECHAY KRASELNICK of Shanghai, China, with a "reporting person" of MORDECHAY KRASELNICK of Panama. KRASELNICK was also listed as the Chairman of FINTEL and as the President of FINTEL but with an address in Miami, Florida. MKA CAPITAL sought to be traded in the United States in the over-the-counter stock markets, such as OTCBB. MKAC, MKA CAPITAL, INC. (MKAC) owned 75% of MK AVIATION, SA (MKA).

18.     Soon after this accident, MORY KRASELNICK sought to transfer his 100% stock ownership of his aviation operations to FINTEL (Financial Telecom Limited USA, Inc.) However, MORY KRASELNICK retained control of more than fifty percent (50%) of the voting rights and assumed the role of Chairman of the Board of FINTEL. FINTEL was then to engage in the business of leasing and sales of aircraft and engines, taking the place of MK AVIATION, S.A.

19.     However, soon after the deal with FINTEL was announced, MKA CAPITAL announced SANCON RESOURCES RECOVERY, INC., a Nevada corporation, would acquire seventy-five percent ownership of MORY KRASELNICK'S aviation leasing business, MK AVIATION, S.A. On May 30-31, 2006, MKA CAPITAL, INC., the Nevada corporation entered into the agreement to dispose of its aviation leasing business.

20.     On June 26, 2006, MKA CAPITAL changed its name to SANCON RESOURCES RECOVERY, INC., and acquired a new stock trading symbol "SRRY." However, MKA CAPITAL continues to exist and internet links for SANCON go directly to MKA CAPITAL.

©2006 Motley Rice LLC. All rights reserved.          6

21.     Furthermore, as of the date of this filing, MKA CAPITAL continues to operate MK AVIATION, S.A. and MK LEASING (USA), LTD., and continues to provide aircraft leasing under the direction of MORY KRASELNICK, Chief Executive Officer.

22.     Therefore at all times material hereto, Defendants MK AVIATION, through its various Nevada corporations and a wholly owned private Panamanian corporation, which were the alter ego of, and wholly owned and operated by its sole shareholder, Defendant MORY KRASELNICK, were engaged in the business of leasing commercial aircraft to common carriers such as WEST CARIBBEAN, and were doing business in this district in the state of Florida and elsewhere in the United States. In 2005, MK AVIATION leased the subject aircraft which crashed and killed all on board to WEST CARIBBEAN and others.

23.     At all times material hereto Defendant, MORY KRASELNICK, individually and as the alter ego of his various companies, maintained a Florida address as well as a Texas, Nevada and other U.S. states addresses, and was owner and director of his various companies, which were the alter ego of KRASELNICK.

24.     At all times material hereto, Defendant GLOBE-TROTTERS DE RIVIÈRE SALÉE TRAVEL, the alter ego of Defendants SAMIR CVRK and VALERIE CVRK, was and is a corporation based in Martinique.

25.     Defendant GLOBE-TROTTERS DE RIVIÈRE SALÉE TRAVEL is subject to the jurisdiction of this court because it transacts business in the

state of Florida, and at the time relevant to this accident, signed a contract which included a choice-of-forum clause with Florida as a possible venue for disputes.

26.     Defendant ASEGURADORA COLSEGUROS, S.A. is a Colombian corporation and liability insurer of the aircraft involved in the fatal accident. Upon information and belief, ASEGURADORA COLSEGUROS, S.A. provides insurance for air carriers that transit this district. Because WEST CARIBBEAN is insolvent, ASEGURADORA COLSEGUROS, S.A. has the obligation to defend WEST CARIBBEAN or alternatively, provide payment for the injuries sustained by the Plaintiff.

## **ALLEGATIONS COMMON TO ALL COUNTS**

27.     On or about November 4, 1986, McDonnell Douglas delivered the subject MD-82 to Continental Airlines, which operated the aircraft under FAA registration N72824 until January 10, 2005, when the aircraft was deregistered so the plane could be exported to Colombia.

28.     On or about October 2001, Continental Airlines retired the aircraft to the Mojave Desert in California where it remained in desert storage until January 2005.

29.     In or about January 2005, Continental Airlines transferred the aircraft to Defendant MK AVIATION, the alter ego of its owner and director Defendant MORY KRASELNICK.

30.     By the time MK AVIATION took possession of the aircraft, the plane had accumulated more than 48,000 hours and 23,000 cycles, thus

©2006 Motley Rice LLC. All rights reserved.          8

requiring expensive parts and highly trained technicians to maintain it in an airworthy condition.

31.    WEST CARIBBEAN was founded in 1998, with the airline's headquarters located on the island of San Andréas in Colombia, South America. WEST CARIBBEAN commenced operations in 2000.

32.    In 2001, a group of investors from Medellín, Colombia joined in ownership of WEST CARIBBEAN and moved the headquarters from San Andréas to Medellín.

33.    From beginning to end, WEST CARIBBEAN'S history can be summed up as a public and colossal business, operational and safety failure, resulting in the senseless deaths of many innocent people. WEST CARIBBEAN suffered a prior airline disaster on March 26, 2005, on the island of Providencia, Colombia, in which eight (8) people died and six (6) were injured.

34.    WEST CARIBBEAN'S poor financial condition, careless and shoddy maintenance operations, and the earlier 2005 crash were precursors which put the Defendants who contracted with WEST CARIBBEAN on notice of the dangerous and deadly conditions at WEST CARIBBEAN.  This constructive notice made wholly foreseeable and predictable the likelihood and possibility of accidents, injuries and other risks to passengers such as those suffered by the Decedent on flight 708.

35.    Before WEST CARIBBEAN'S two plane crashes in 2005, the Colombian Civil Aviation Authority ("Aerocivil") had previously cited WEST CARIBBEAN for fourteen (14) "very serious violations to aviation safety."

©2006 Motley Rice LLC.  All rights reserved.          9

36.    These prior infractions included a lack of training for the crew, illegal mishandling of flight logs, improper aircraft maintenance, breach in the control of routes and airports, false records of flights on each airplane, flight times of the crew, and assignments exceeding flight time limits.

37.    Because of the safety lapses, on January 5, 2005 the Aerocivil imposed a fine of approximately $89,000 on the airline, imposed sanctions on twenty-three (23) pilots, twenty-nine (29) flight attendants, and suspended operations on eight (8) aircraft for three (3) days.  The fine was reduced by 50% due to WEST CARIBBEAN'S poor financial condition.

38.    Despite the known financial stress of WEST CARIBBEAN and the safety violations and suspended operations, Defendants MK AVIATION, the alter ego of Defendant MORY KRASELNICK, leased the accident aircraft, then registered as HK 4374X, to Defendant WEST CARIBBEAN.

39.    As evidenced by the previous fatal accident and the sanctions for safety violations imposed by the Colombian Civil Aviation Authority, WEST CARIBBEAN was unable to support the aircraft technically or financially.

40.    On May 2, 2005, the Colombian Ports and Transportation Supervision Department imposed an injunction on WEST CARRIBEAN, based on its poor financial condition. This decision was due to an evaluation of WEST CARIBBEAN'S financial statements that diagnosed an inevitable business failure.

41.    Nevertheless, WEST CARIBBEAN willfully, wantonly, recklessly and negligently continued to fly its dangerous aircraft, and failed to provide the

proper training or rest for WEST CARRIBEAN crews, needlessly risking the lives of every passenger that boarded its dangerous planes, which may well be described as "flying coffins".

42.    In the spring of 2005, Defendant GLOBE-TROTTERS DE RIVIÈRE SALÉE TRAVEL, the alter ego of Defendants SAMIR CVRK and VALERIE CVRK, marketed to the public a week long trip from Martinique to the Republic of Panama, including round-trip air travel, for €1280 per person, excluding taxes.

43.    Defendant GLOBE-TROTTERS contracted with approximately six hundred customers for this package, with departure dates of July 14, 2005, July 25, 2005, August 1, 2005, August 8, 2005, and August 15, 2005.

44.    Defendant GLOBE-TROTTERS was insured with Generali Assurance (IARD) in a policy underwritten by John Pascal Coutou in Dijon, France.

45.    The above-named policy was effective from November 14, 2004 through November 15, 2005.

46.    Defendant GLOBE-TROTTERS included in their advertising circulars that the trip would be insured for €400,000.

47.    Defendant GLOBE-TROTTERS contracted Defendants NEWVAC CORPORATION and/or GO 2 GALAXY, INC., of Florida, U.S.A., both alter egos of Defendant JACQUES CIMETIER, to supply air travel between Martinique and Panama.

48.    Solely entrusted with the selection of the air carrier to provide transportation between Fort-de France, Martinique and Panama City, Republic

of Panama, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER sought to contract for the cheapest air travel possible to maximize their profits and in doing so they disregarded their duty to provide safe transportation for the passengers.

49.    Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER contracted with WEST CARIBBEAN; together they provided air travel for paying passengers for trips between Fort-de France, Martinique and Panama City, Republic of Panama.

50.    On March 15, 2005, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER agreed to pay West Caribbean $4800 per hour for the round trip flights from Fort-de France, Martinique to Panama City, Republic of Panama.  This arrangement is known in the industry as a "wet lease."  By wet-leasing aircraft and providing passenger service, NEWVAC and/or GALAXY and/or JACQUES CIMETIER assumed the role and responsibility of an indirect air carrier.

51.    The term wet lease means any leasing arrangement whereby a person agrees to provide an aircraft and at least one pilot flight crew member to another person.  Wet leasing by, from or through any entity in the U.S. is governed by the U.S. Federal Aviation Regulations.

52.    Both Panama and France are signatories to the Montreal Convention for the Unification of Certain Rules for International Carriage by Air (Montreal Convention), an international treaty that governs the duties and rights of those involved in international air transport.

53.    WEST CARIBBEAN Flight 708 from Panama City, Panama to Fort-de-France, Martinique, France was a flight involved in international air transport, as defined by the Montreal Convention.

54.    Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER as principal(s), made a contract of carriage governed by the Montreal Convention with a person acting on behalf of the passengers (Defendant GLOBE-TROTTERS), thus assuming the role of a contracting carrier under the Montreal Convention, Article 39.

55.    On April 25, 2005, one month after the first fatal accident of WEST CARIBBEAN, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER agreed to sell Defendant GLOBE-TROTTERS the requested air travel between Fort-de-France, Martinique, and Panama City Panama.

56.    Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., JACQUES CIMETIER, and GLOBE-TROTTERS entered this contract for $700,000, and stipulated that this contract would be subject to Florida law.

57.    In May 2005, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER in its role as a contracting carrier submitted a Request for Authorization of International Charter of Flight to a department of the government of France (DGAC) seeking approval for WEST CARIBBEAN to operate the flights.

58.    As a pre-condition to this approval, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER had to

©2006 Motley Rice LLC.  All rights reserved.       13

demonstrate that the aircraft was properly insured under EU Regulation 785/2004, Art. VII.

59.     However, WEST CARIBBEAN'S general insurance was due to lapse and in fact did lapse on July 5, 2005.

60.     Because WEST CARIBBEAN'S general insurance lapsed, Defendants NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER needed to secure insurance to cover their air operations with WEST CARIBBEAN, and presented proof to the DGAC that the accident aircraft, HK 4374X, was insured for the period of June 13, 2005 through July 5, 2006 in the amount of $450 million.

61.     The policy above was underwritten by Defendant ASEGURADORA COLSEGUROS, S.A., an Allianz Corporation.

62.     The Request for Authorization of International Charter of Flight was approved on June 17, 2005, by the Direction de la Régulation Economique in France.

63.     The accident aircraft was the only WEST CARIBBEAN aircraft insured after July 5, 2005, and was in fact the only aircraft flown by WEST CARIBBEAN after July 5, 2005, and it was insured, operated, and flown because of the actions of NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER.

64.     The strain of trying to run an airline and supply charter flights with only one aircraft caused immeasurable fatigue on air crews, maintenance technicians, approved parts supplies and/or the aircraft.

©2006 Motley Rice LLC.  All rights reserved.        14

65.   It was widely reported, and thus well known, that in order to keep its one aircraft flying, WEST CARIBBEAN circulated lists soliciting desired "black market" parts, that is, unregistered and unapproved parts that render an aircraft unairworthy.

66.   It was also known that WEST CARIBBEAN illegally "cannibalized" the two similar aircraft stored in its maintenance base, that is, illegally switched spare parts from one airplane to another.

67.   Despite their knowledge of the financial stress and the documented and public poor safety conditions of WEST CARIBBEAN, MK AVIATION and MORY KRASELNICK made no attempt to withdraw from WEST CARIBBEAN'S control the MD-82 HK4374X, a dangerous instrumentality that WEST CARIBBEAN was demonstrably unequipped to safely utilize.

68.   On August 16, 2005, the inevitable and foreseeable occurred. The ill-fated MD-82, now known as Flight 708, arrived at Panama City-Tocumen after a flight from Medellín-José María Córdova Airport to pick up a group of tourists from Martinique who had purchased travel on the flight and had flown to Panama for a few days of shopping and enjoyment.

69.   Flight 708 departed Panama City at about 0600 Coordinated Universal Time ("UTC") (01:00 a.m. local time) and climbed to its cruising altitude of 31,000 feet.  This altitude was reached at approximately 0625 UTC. Sixteen minutes later the airplane began a normal climb to 33,000 feet.

70.    At 0649 UTC the speed began to steadily decrease from Mach 0.76. The horizontal stabilizer moved from approximately 2 units nose up to 4 units nose up during this deceleration.

71.    At 0651 UTC the crew reported at 33,000 feet over the SIDOS waypoint, over the Colombian/Venezuelan border, and requested a direct course to the ONGAL waypoint. The controller instructed the crew to continue on the present heading and to await further clearance direct to ONGAL.

72.    The flight crew meanwhile discussed weather concerns that included possible icing conditions and the possible need to turn on engine and airfoil anti-ice.

73.    At 0657 UTC the flight crew requested permission to descend to 31,000 feet, which was approved. The autopilot was disconnected and the airplane started to descend.

74.    As the airplane descended past 31,500 feet, the airspeed continued to decrease and the engine pressure ratio decreased to approximate flight idle. Two minutes later a further descent to 29,000 was requested, but the controller at Maiquetía did not understand that this was a request from flight 708 and asked who was calling.

75.    Flight 708 responded and immediately requested descent to 24,000 feet. The controller inquired about the state of the aircraft, to which they responded that both engines had flamed out. The controller then cleared the flight to descend at the pilot's discretion.

©2006 Motley Rice LLC. All rights reserved.        16

76.     In the meantime, the altitude alert warning had activated, followed by the stick shaker and the aural stall warning alert. The airspeed had reached a minimum of about 150 indicated air speed (IAS) knots at about 25,000 feet. The crew reported descending through 14,000 and reported that they were not able to control the airplane.

77.     At no time did the West Caribbean flight crew initiate any emergency procedures or in any way attempt to diagnose or solve the problems the aircraft was experiencing.

78.     At no time did the flight crew initiate aerodynamic stall recovery procedures.

79.     The flight crew was either mistaken about the engine flame-out, or the engines re-ignited with no further action by the flight crew.

80.     The aircraft descended at a rate of 7,000 feet per minute, putting it into a virtual nose dive, and finally it crashed in a swampy area.  The entire terrifying 33,000 feet drop to impact had taken approximately 3 minutes and 30 seconds.

81.     The aircraft impacted the ground with both engines operating and the horizontal stabilizer trim in the full nose-up position.

82.     All 160 passengers and crew on board were killed, including Decedent JIMMY JOACHIM-ARNAUD.   It was the second worst aviation accident involving an MD-80 since MD-80s were put into service, and the worst aviation accident ever to have occurred in Venezuela.

©2006 Motley Rice LLC.  All rights reserved.

83. Defendants MK AVIATION has already capitalized and been unjustly enriched on the tragedy it precipitated by collecting $3.5 million in insurance proceeds on a hull loss insurance policy maintained on an aircraft (HK 4374X) with a book value of $1.53 million, netting a "death profit" of $1.97 million. Plaintiff seeks disgorgement of this unjust enrichment for the benefit of the families of the Decedents.

84. WEST CARIBBEAN, as well as NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER were at all times relevant common carriers engaged in the business of transporting fare-paying passengers and crew members to destinations in Central and/or South America on regularly scheduled and chartered domestic and international flights, in aircraft owned, leased, operated, managed, maintained, and/or controlled by Defendants, and each of them, and their agents and/or employees, acting within the course and scope of their employment.

85. As a common carrier, WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER were obligated to provide the highest degree of care in the maintenance and operation of the aircraft while under its control. In this respect, WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and/or JACQUES CIMETIER owed the highest degree of care to all persons aboard Flight 708.

86. WEST CARIBBEAN breached its duty of care as a wet-lessee and co-wet-lessee operator of the aircraft by willfully, wantonly, recklessly and

©2006 Motley Rice LLC. All rights reserved.           18

negligently failing to properly maintain the aircraft during time it was under its operation and control.

87.    As owner/lessor of the aircraft, Defendants, MK AVIATION and MORY KRASELNICK were obliged to provide the highest degree of care in the maintenance and operation of the aircraft while under its ownership and control, and obligated to recognize the aircraft as an inherently dangerous instrumentality.

88.    MK AVIATION and MORY KRASELNICK owed the highest degree of care to all persons aboard Flight 708. MK AVIATION and MORY KRASELNICK breached their duty as owners and/or lessors by willfully, wantonly, recklessly and negligently dumping an old and ailing plane onto a struggling carrier without regard to airworthiness or the safety of WEST CARIBBEAN operations, and thus ultimately delivered a dangerous instrumentality to WEST CARIBBEAN and put into motion the disastrous chain of events set forth herein.

89.    MK AVIATION, along with its alter ego Defendant MORY KRASELNICK, as owners/lessors of the aircraft to WEST CARIBBEAN, had a duty to inspect, maintain, and repair the subject aircraft and owed the highest degree of care to all persons aboard Flight 708 at the time of the crash.

90.    MK AVIATION and MORY KRASELNICK were unjustly enriched and profited from the death of those passengers, including Decedent NICOLAS MASSAL, and should be disgorged of their "death profits" and those "death

©2006 Motley Rice LLC. All rights reserved.

profits" should more properly be applied to compensate the families of the Decedents.

91.     MK AVIATION and MORY KRASELNICK had an affirmative duty to keep this aircraft, a dangerous instrumentality, out of the control of an entity that it knew, or in the exercise of due diligence should have known, was incapable of safely and properly maintaining or operating the jet aircraft.

92.     WEST CARIBBEAN operated the McDonnell-Douglas MD-82, a dangerous instrumentality, which was used to transport passengers and crew members on August 16, 2005, while operating as WEST CARIBBEAN AIRWAYS Flight No. 708, which is the subject matter of this suit.

93.     WEST CARIBBEAN was responsible for the safe and proper maintenance of the aircraft, for the safe and proper operation of the aircraft during its flight, and for the proper training, currency and rest requirements of the flight crew.

94.     WEST CARIBBEAN, a common carrier, was obligated to provide the highest degree of care in the maintenance and operation of the airline and specifically the subject aircraft, a dangerous instrumentality.

95.     WEST CARIBBEAN breached its duty of care by willfully, wantonly, recklessly and negligently failing to operate and maintain the subject aircraft in a safe and airworthy manner.

96.     JIMMY JOACHIM-ARNAUD, Deceased, was at all times material, a passenger on Flight 708, and was a French citizen and resident when JIMMY

JOACHIM-ARNAUD was killed by the willful, wanton, reckless, and negligent misconduct of WEST CARIBBEAN and others as set forth herein.

97.    As a result of the aforementioned negligence of all Defendants, JIMMY JOACHIM-ARNAUD was killed.  SIMONE JOACHIM-ARNAUD, Personal Representative of the Estate of JIMMY JOACHIM-ARNAUD, Deceased, has brought this action on behalf of all heirs and beneficiaries of JIMMY JOACHIM-ARNAUD.

## COUNT I
## NEGLIGENCE AND VICARIOUS LIABILITY AGAINST ALL DEFENDANTS

98.    Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

99.    At all times material Defendants, jointly and severally, owed a duty to all persons aboard WEST CARIBBEAN AIRWAYS Flight 708 to operate and control the subject aircraft, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by the improperly maintained and operated aircraft.

100.   The air crash which occurred on August 16, 2005, and which resulted in the deaths of all on board, was a direct and proximate result of the negligence and willful misconduct alleged herein of Defendants and each of them.

101.   Defendants, and each of them, by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to Plaintiff in some or all of, but not limited to, the following regards:

©2006 Motley Rice LLC.  All rights reserved.          21

a.)   By entrusting the passengers to the care of a known unsafe operator;

b.)   By placing an inherently dangerous instrumentality, aircraft HK-4374X, under the control of an entity incapable of protecting itself or others from harm;

c.)   By failing to properly train and educate the flight crew on the fundamentals of flight in weather, high altitude flight, operating in icing conditions, stall recognition and recovery, and emergency checklist procedures.

d.)   By failing to load the aircraft in compliance with weight and balance restrictions and gross weight limitations;

e.)   By failing to provide and/or perform proper and adequate maintenance and/or repairs to the subject aircraft;

f.)   By failing to properly inspect the subject aircraft on a regular and timely basis;

g.)   By failing to properly test the instruments, controls, and/or equipment installed on said aircraft to insure that they were in good and proper working order;

h.)   By failing to replace and/or overhaul old worn out and unsuitable components, equipment, instruments, and/or parts on the subject aircraft;

i.)   By failing to observe the operative and applicable governmental regulations and directives pertaining to the maintenance, inspection and/or repair of the subject aircraft;

j.)   By failing to furnish a proper and airworthy aircraft;

k.)   By failing to contract and/or wet-lease aircraft and crew from a safe flight operator and/or;

l.)   By acting as a contracting carrier without reasonable safety, training, due diligence, precautions, inspection, or appropriate standards of care and safety.

©2006 Motley Rice LLC. All rights reserved.

WHEREFORE, Plaintiff, hereby demands judgment against the Defendants, jointly and severally, for all actual, compensatory, consequential and punitive damages, including without limitation, damages for moral damages, mental pain and suffering and physical injuries, plus interest, costs and reasonable attorneys fees, and such other damages as this Honorable Court deems just and proper.

**COUNT II**
**WILLFUL AND WANTON MISCONDUCT AGAINST ALL DEFENDANTS**

102. Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

103. The crash and consequent deaths of the Plaintiff's Decedent was the direct and immediate result of the willful, wanton, reckless, and/or grossly negligent misconduct of Defendants, and each of them in failing and refusing to protect those persons aboard Flight 708 from known dangers of an extraordinary nature, posed by the unsafe aircraft and its unsafe operations.

104. WEST CARIBBEAN had been fined many times for violations and several of its airplanes had been grounded for inadequate maintenance before it contracted for Flight 708.

105. Specifically, prior to and on August 16, 2005 Defendants, and each of them, had actual and constructive knowledge that the operation of the above-described flight was subject to dangers posed by their failure to properly maintain and operate their aircraft, registered as HK-4374X.

106. When Defendants, and each of them, sold, contracted for, operated, wet-leased, and flew HK-4379X, they had actual knowledge that

©2006 Motley Rice LLC. All rights reserved.     23

WEST CARIBBEAN'S condition was not good, their insurance had lapsed, and the Defendants had to purchase a separate policy for the plane to be able to make the flights for their Defendants.

107. Notwithstanding this knowledge, Defendants and each of them, failed and refused to warn the persons aboard Flight 708 of the known dangers and/or failed and refused to protect those persons from the known risk by failing to take precautionary measures, and to perform the necessary regular and ongoing maintenance and/or safe operation of the airplane.

108. The crash of the above-described flight on August 16, 2005, was caused by such known and reasonably foreseeable conditions.

109. By reason of the above-stated acts of wanton, willful, reckless, and/or grossly-negligent conduct, evidencing willful and reckless indifference to the safety, welfare, health, security, and well-being of their passengers and crew members, including the Plaintiff's Decedent, in the face of known and notorious risks, Defendants, and each of them, are liable to the Plaintiff for exemplary damages.

WHEREFORE, Plaintiff hereby demands judgment against the Defendants, jointly and severally, for all actual, compensatory, consequential and punitive damages, including without limitation, moral damages and damages for mental pain and suffering and physical injuries, plus interest, costs and reasonable attorneys fees, and such other damages as this Honorable Court deems just and proper.

©2006 Motley Rice LLC. All rights reserved.    24

## COUNT III
## WRONGFUL DEATH AGAINST ALL DEFENDANTS

110. Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

111. At all times material, Defendants, jointly and severally, owed a duty to all persons aboard West Caribbean Airways Flight 708 to operate and control the subject aircraft, on the ground and in the air, with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury and death as a result of known dangers posed by improperly maintained aircraft.

112. The air crash which occurred on August 16, 2005, and which resulted in the deaths of all on board, was a direct and proximate result of the negligence and willful misconduct hereinafter alleged of Defendants.

113. Defendants, by and through their agents, employees, and representatives, willfully and otherwise breached the duty owed to Plaintiff's Decedent in some or all of, but not limited to, the following regards:

      a.)    By entrusting the passengers to the care of a known unsafe operator;

      b.)    By placing an inherently dangerous instrumentality, aircraft HK-4374X, under the control of an entity incapable of protecting itself or others from harm;

      c.)    By failing to properly train and educate the flight crew on the fundamentals of flight in weather, high altitude flight, operating in icing conditions, stall recognition and recovery, and emergency checklist procedures.

      d.)    By failing to load the aircraft in compliance with weight and balance restrictions and gross weight limitations;

e.)    By failing to provide and/or perform proper and adequate maintenance and/or repairs to the subject aircraft;

f.)    By failing to properly inspect the subject aircraft on a regular and timely basis;

g.)    By failing to properly test the instruments, controls, and/or equipment installed on said aircraft to insure that they were in good and proper working order;

h.)    By failing to replace and/or overhaul old worn out and unsuitable components, equipment, instruments, and/or parts on the subject aircraft;

i.)    By failing to observe the operative and applicable governmental regulations and directives pertaining to the maintenance, inspection and/or repair of the subject aircraft;

j.)    By failing to furnish a proper and airworthy aircraft;

k.)    By failing to operate the aircraft in a safe and competent manner, thereby resulting in the crash in question;

l.)    By failing to contract and/or wet-lease aircraft and crew from a safe flight operator; and/or

m.)    By acting as a contracting carrier without reasonable safety, training, due diligence, precautions, inspection, or appropriate standards of care and safety.

WHEREFORE, Plaintiff hereby demands judgment, jointly and severally, against the Defendants for:

a.)    Pre-Impact fear and terror and pain and suffering of the Decedent prior to his death;

b.)    Pain and suffering of the Decedent's family/or beneficiaries from the date of Decedent's death;

c.)    Loss of consortium, society, companionship, support and services from the date of Decedent's

©2006 Motley Rice LLC. All rights reserved.    

death;

d.) Loss of support in money or in kind from the date of the Decedent's death;

e.) Loss of prospective net estate accumulations beyond death of the Decedent, reduced to present value;

f.) Grief, emotional distress and personal injuries and moral damages as allowed by law;

g.) Funeral expenses due to Decedent's death that may become a charge against the estate or that were paid by or on behalf of the Decedent; and

h.) Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law.

## COUNT V
## NEGLIGENT ENTRUSTMENT AS TO DEFENDANTS
## MK AVIATION AND MORY KRASELNICK

114. Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

115. Defendants MK AVIATION and MORY KRASELNICK were engaged in the business of leasing the aircraft and its engines that are the subject matter of this Complaint.

116. MK AVIATION knew, constructively knew, or in the exercise of reasonable care, should have known that WEST CARIBBEAN had been cited for numerous safety violations.

117. MK AVIATION knew, constructively knew, or in the exercise of reasonable care should have known, that WEST CARIBBEAN was under severe financial stress.

118. MK AVIATION knew, constructively knew, or in the exercise of reasonable care should have known, that WEST CARIBBEAN had lost its insurance.

119. MK AVIATION knew, constructively knew, or in the exercise of reasonable care should have known, that WEST CARIBBEAN was seeking bogus parts on the black market, and "cannibalizing" other aircraft to keep the accident aircraft airborne.

120. MK AVIATION knew, constructively knew, or in the exercise of reasonable care should have known, that WEST CARIBBEAN was incapable of providing adequate maintenance or training, and thus incapable of safely operating the aircraft in question.

121. MK AVIATION knew, constructively knew, or in the exercise of reasonable care should have known that the aircraft, HK-4374X, was a dangerous instrumentality.

122. MK AVIATION willingly supplied this dangerous instrumentality to an entity that was incompetent to operate it.

123. Because MK AVIATION supplied this dangerous instrumentality to an incompetent entity, it knew, or constructively knew, or in the exercise of reasonable care should have known, that this transaction would endanger the lives of third parties exposed to this instrumentality.

124. 160 people were killed by the completely foreseeable risk created by negligently entrusting this dangerous instrumentality to an incompetent operator.

©2006 Motley Rice LLC. All rights reserved.    28

WHEREFORE, Plaintiff, hereby demands judgment against the Defendants, jointly and severally, for all actual, compensatory, consequential and punitive damages, including without limitation, damages for mental pain and suffering and physical injuries, disgorgement of the profits MK AVIATION realized from the insurance proceeds for the destroyed hull, plus interests, costs and reasonable attorneys fees, and such other damages as this Honorable Court deems just and proper.

**COUNT VI**
**WRONGFUL DEATH AND SURVIVAL DAMAGES UNDER THE MONTREAL CONVENTION AS TO WEST CARIBBEAN AND NEWVAC CORPORATION and/or GO 2 GALAXY, INC., ALTER EGOS OF JACQUES CIMETIER, AND JACQUES CIMETIER**

125. Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

126. By contract dated April 25, 2005, the Defendants WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER agreed between and amongst each other to provide international air transport to certain passengers.

127. Under the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, Defendants WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER are each carriers by and through their contract dated April 25, 2005, each serving as an agent of the other.

128. Under Article 39 of the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, Defendant WEST CARIBBEAN

was the actual carrier, and NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER were the contracting carriers.

129.   Under the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, Defendants WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER are each jointly and severally liable for damages sustained by the passengers aboard West Caribbean Flight 708.

130.   Under Article 21(1) of the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, Defendants are absolutely liable to the Plaintiff for injuries sustained by their passengers engaged in international travel, as defined in Article 1 of the Montreal Convention, up to the sum of 100,000 Special Drawing Rights (SDR) without proof of fault or negligence on the part of the carriers, in this case WEST CARIBBEAN, NEWVAC CORPORATION, GO 2 GALAXY, INC., and JACQUES CIMETIER.

131.   Under Article 21(1) of the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, Defendants are liable to the Plaintiff for damages to their passengers exceeding 100,000 Special Drawing Rights (SDR), unless the carriers prove that they committed no negligence in their transport of these passengers.

132.   The horrific crash of the aircraft and the deaths of the passengers preclude a showing of no negligence on the part of the Defendant carriers, and the crash is a *res ipsa loquitur* demonstration of negligence.

©2006 Motley Rice LLC.  All rights reserved.

WHEREFORE, Plaintiff hereby demands judgment, jointly and severally, against the Defendants for:

a.) Pain and suffering and pre-impact terror and fright of the Decedent prior to his death;

b.) Pain and suffering of Decedent's family and heirs from the date of Decedent's death;

c.) Loss of consortium, society, companionship, support and services from the date of Decedent's death;

d.) Loss of support in money or in kind from the date of the Decedent's death;

e.) Loss of prospective net estate accumulations reduced to present value;

f.) Moral harm, grief, emotional distress and other such personal injuries;

g.) Funeral expenses due to Decedent's death that may become a charge against the estate or that were paid by or on behalf of the Decedent;

h.) Any other damages to which the Plaintiff, survivors and/or beneficiaries may be entitled under applicable law;

i.) Pre-judgment interests;

j.) Costs and attorneys fees.

## COUNT VII
## EQUITABLE RELIEF

133. Plaintiff incorporates by reference all prior allegations above as if fully set forth herein.

134. According to Form 10-KSB filed with the United States Securities and Exchange Commission on April 26, 2006, MKA CAPITAL (a subsidiary of

©2006 Motley Rice LLC. All rights reserved.       31

MK AVIATION), and alter ego MORY KRASELNICK collected $3.5 million in insurance proceeds on the insurance policy of the subject aircraft, listing a book value of $1.53 million, resulting in a gain of $1.97 million.

135. Defendants MK AVIATION and/or its subsidiaries and MORY KRASELNICK should not be allowed to experience this "death profit" and benefit from its negligent, wanton, willful misconduct at the expense of innocent passengers.

WHEREFORE, Plaintiff hereby prays for equitable relief in the form of disgorgement of the profits MK AVIATION and/or MORY KRASELNICK realized from the insurance proceeds for the destroyed aircraft. In the alternative, Plaintiff respectfully requests that this Court grant such equitable relief as justice and fairness requires.

## JURY DEMAND

Plaintiff, SIMONE JOACHIM-ARNAUD, Personal Representative of the Estate of JIMMY JOACHIM-ARNAUD, Deceased, hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

**MOTLEY RICE, LLC**

By: _____

Mary Schiavo, Esquire
*Pro hac Vice*
Robin Anderson, Esquire
Fla. Bar # 748811
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9138
Facsimile (843) 216-9440
mschiavo@motleyrice.com

©2006 Motley Rice LLC. All rights reserved.

Edward Montoya, Esquire
Fla. Bar #0972649
Montoya Lopez, P.L.
4000 Ponce de Leon Blvd., Suite 470
Coral Gables, Florida  33134
Telephone:   (305) 445-9292
Facsimile:   (305) 445-9249
emontoya@montoyalopez.com

DATED:     January 11, 2007

©2006 Motley Rice LLC.  All rights reserved.

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

07-20119
CIV-JORDAN

## I. (a) PLAINTIFFS

SIMONE JOACHIM-ARNAUD, As Personal Representative of the Estate of JIMMY JOACHIM-ARNAUD, Deceased,

**DEFENDANTS**

West Caribbean Airways, U.S. Aviation, Inc.

**(b)** County of Residence of First Listed Plaintiff  France
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Mary Schiavo, Esquire (Pro Hac Vice)
28 Bridgeside Boulevard
Mount Pleasant, SC  29464  (843)-216-9138

FILED by ___ D.C.
INTAKE
JAN 1 6 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

Attorneys (If Known)

TORRES

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ☐ MONROE ☐ BROWARD ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

Dade 07-20119-Civ Jordan

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☑ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☑ 120 Marine | ☑ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO      b) Related Cases ☑ YES ☐ NO

JUDGE Ursula Ungaro-Benages      DOCKET NUMBER 06-22748, 06-22750, 06-22751

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 USC §1331, 1332, 1367 & 1369 (Wrongful Death -negligence- mass tort-airplane crash)

LENGTH OF TRIAL via 21 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD  Mary Schiavo

DATE 01/11/07

FOR OFFICE USE ONLY
AMOUNT $350.00  RECEIPT # 953075
01/16/07

Case 1:07-cv-20119-DMM   Document 1   Entered on FLSD Docket 01/16/2007   Page 35 of 36
Case 1:06-cv-22748-UU   Document 20   Entered on FLSD Docket 12/28/2006   Page 36 of 37
Case 1:06-cv-22748-UU   Document 18-2   Entered on FLSD Docket 12/21/2006   Page 1 of 2

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO.: 06-CV-227478-UNGARO-BENAGES/O'SULLIVAN

HENRI GALBERT, As Personal )
Representative of the Estate of )
NICOLAS MASSAL, Deceased, )
)
           **Plaintiff,** )
)
           vs. )
)
WEST CARIBBEAN AIRWAYS, a )
Colombian corporation; et al., )
)
           Defendants. )

CIV-ALTONAGA

### ORDER TO CONSOLIDATE

This cause having come before the Court on Plaintiff's Motion to Consolidate case numbers 06-22748, 06-22750, 06-22751, and 06-22752 for discovery purposes, to conserve judicial resources and in the interests of judicial efficiency. Plaintiff's Motion is hereby granted.

IT IS SO ORDERED that case numbers 06-22750, 06-22751, and 06-22752 be and are hereby consolidated with Case No. 06-22748 before the Honorable Ursula Ungaro-Benages for discovery purposes and to conserve judicial resources and in the interests of judicial efficiency.

IT IS FURTHER ORDERED that all subsequently filed matters which are the result of this common accident, and be hereby consolidated under case number 06-22748 for discovery purposes and to conserve judicial resources.

Case 1:07-cv-20119-DMM   Document 1   Entered on FLSD Docket 01/16/2007   Page 36 of 36
Case 1:06-cv-20233-CMA-U   Document 20   Entered on FLSD Docket 01/08/2007   Page 37 of 37
Case 1:06-cv-22748-UU   Document 18-2   Entered on FLSD Docket 12/21/2006   Page 2 of 2

**IT IS FURTHER ORDERED** that all the Consolidated Initial Planning and Scheduling Conferences scheduled for February 2, 2006 in case numbers 06-22748, 06-22750, 06-22751 and 06-22752 be and are hereby stayed until March 2, 2006, until such time as the Defendants in this matter have been served.

The Clerk is directed to note such consolidation on the docket.


DATED: 12/22/06


_Ursula Ungaro_
**URSULA UNGARO**
DISTRICT JUDGE
Southern District of Florida
Miami Division